Jimmie W. Pursell, Jr. - 19957
jpursell@jsslaw.com
**JENNINGS, STROUSS & SALMON, P.L.C.**
A Professional Limited Liability Company
The Collier Center, 11th Floor
201 East Washington Street
Phoenix, Arizona 85004-2385
Telephone: (602) 262-5911

Michael O. Kassak
Christopher P. Leise
Edward M. Koch
kassakm@whiteandwilliams.com
leisec@whiteandwilliams.com
koche@whiteandwilliams.com
**WHITE AND WILLIAMS LLP**
Liberty View
457 Haddonfield Road, Suite 400
Cherry Hill, NJ 08002-2220
Telephone: (856) 317-3600

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Gradient Analytics, Inc., Donn Vickrey, and James Carlton Carr Bettis, | : | CIVIL ACTION |
| | : | |
| | : | |
| *Plaintiffs* | : | JURY TRIAL DEMANDED |
| | : | |
| v. | : | |
| | : | |
| Biovail Corporation, Biovail Pharmaceuticals Inc., and Biovail Pharmaceuticals, LLC. | : | |
| | : | |
| | : | |
| *Defendants* | : | **COMPLAINT** |
| | : | |
| | : | |

## THE PARTIES

1.      Plaintiff, Gradient Analytics, Inc., ("Gradient"), formerly known as Camelback Research Alliance, Inc., is an Arizona corporation with its principal place of business in Scottsdale, Arizona.

2.      Gradient is an independent stock-research firm that provides independent analysis of the investment potential of public companies.

3.      Plaintiff, Donn Vickrey ("Vickrey"), is a resident of California.   Dr. Vickrey has been an employee of Gradient Analytics, Inc. since 1996, and periodically works at the main office of Gradient in Scottsdale, Arizona.

4.      Plaintiff, James Carlton Carr Bettis ("Bettis"), is a resident of Arizona.

5.      Vickrey and Bettis co-founded Gradient, which was then known as Camelback Research Alliance, Inc. (as Camelback is no longer a legal entity all references herein will be to "Gradient"), along with Stephanie Bettis in Arizona.

6.      Defendant, Biovail Corporation ("Biovail"), is a Canadian corporation with its head office in Mississauga, Ontario, Canada.

7.      Biovail operates facilities in Barbados, Canada, United States, and Puerto Rico.

8.      Biovail is engaged in the formulation, clinical testing, registration, manufacture, distribution, and commercialization of pharmaceutical products throughout the United States, including Arizona.   These products include the well-known brands Cardizem® CD, Ativan®, Vaseretic®, Vasotec®, and Isordil®.

9.      Biovail Pharmaceuticals, Inc., is a Delaware corporation and a wholly owned subsidiary of Biovail Corporation with its corporate headquarters in Bridgewater, New Jersey.

3440070v1(50538.13)

10.     Biovail Pharmaceuticals, LLC, is a Delaware limited liability company with its principal place of business in Bridgewater, New Jersey.  Biovail Pharmaceuticals, LLC and Biovail Pharmaceuticals, Inc. are referred to collectively herein as "Biovail Pharmaceuticals."

### VENUE AND JURISDICTION

11.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as diversity of citizenship exists among the parties and the amount in controversy far exceeds the sum of $75,000, exclusive of interest and costs.  This Court also has supplemental jurisdiction over all state claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because Defendants are subject to personal jurisdiction in this District under 28 U.S.C. § 1391(c) and/or because a substantial part of the events giving rise to the claims in this action occurred in this District under 28 U.S.C. § 1391(a)(2).

### INTRODUCTION

13.     Biovail is a pharmaceutical company whose common stock is traded on the New York and Toronto stock exchanges.

14.     In 2002 and 2003, Biovail was preparing for the launch of two new drugs: Cardizem LA and Wellbutrin XL.

15.     The launch of the drugs was deemed by financial analysts as critical to Biovail's efforts to become a specialty pharmaceutical business.

16.     As detailed at length below, Biovail's launches of Cardizem LA and Wellbutrin XL did not go well for the company.

17.     At a time it knew the new products were not performing well, Biovail issued materially false and misleading projections and press releases in order to mislead investors and artificially inflate Biovail's stock price.

- 3 -

18.     Biovail misrepresented the success of the launch of Cardizem LA, in part, by relying upon the volume of prescriptions generated by way of an illegal scheme by which Biovail provided doctors with monetary kickbacks for prescribing Cardizem LA.

19.     Later, Biovail falsely represented that Wellbutrin XL's earnings failed to meet expectations as a result of an October 2003 traffic accident involving a purported $20 million shipment of Wellbutrin XL, despite the fact that this accident had no material effect on Biovail's earnings.

20.     Biovail's systematic misrepresentations and concealment of the truth about the success of the new products began to unravel in late 2003 when the true facts regarding the earnings generated by the launches of Cardizem LA and Wellbutrin XL became known.

21.     As a result, the price of Biovail's stock tumbled.

22.     Thereafter, shareholders who had been misled and deceived by Biovail filed 13 separate class action lawsuits in the United States District Court for the Southern District of New York.

23.     Instead of accepting responsibility for the failed launch of the two products and defending itself from the serious allegations in the shareholder lawsuits, Biovail launched a diversionary attack by fabricating an alleged conspiracy of traders and analysts, including  Plaintiffs herein, who had purportedly acted to drive down the price of Biovail stock.  Biovail knew these allegations were false when made and also knew that the actions of the alleged members of the conspiracy, including Plaintiffs, did not and could not have had any material impact on the price of Biovail stock.  This attack was also motivated by Biovail's desire to chill the first amendment rights of any analyst or research firm who criticized Biovail.

- 4 -

24.     In response to the shareholder lawsuits and press coverage of governmental investigations into its operations, Biovail also orchestrated the filing of two separate lawsuits (the "Lawsuits") against the purported members of the fictional conspiracy.

25.     The main thrust of Biovail's litigation offensive was the assertion that certain analysts, including Plaintiffs, issued materially false reports regarding Biovail, at the instruction of certain investors, in order to drive the price of Biovail's stock down as part of a short-selling scheme.

26.     The Lawsuits had no basis in fact or law and were ultimately dismissed by the Courts.

27.     In addition to orchestrating the filing of the Lawsuits, Biovail also hired private investigators to harass and intimidate some of the individually named members of the purported conspiracy, as well as employees of the businesses involved, including Plaintiffs.

28.     After fabricating the conspiracy, orchestrating the baseless lawsuits, and unleashing its overly aggressive investigators, Biovail's scapegoating scheme began to fall apart as a result of investigations by the Securities and Exchange Commission ("SEC"), the United States Department of Justice ("DOJ"), and the Ontario Securities Commission ("OSC") regarding Biovail's misrepresentations and actions associated with the launches of Cardizem LA and Wellbutrin XL.

29.     As a result of these investigations, the SEC, DOJ, and OSC brought serious charges against Biovail.  After a change in its Board of Directors, Biovail acknowledged responsibility for its fraudulent misrepresentations and criminal conduct by reaching multi-million dollar settlements with the SEC and the OSC and entering into a criminal guilty plea with regard to charges brought by the DOJ.  In addition, Biovail paid $138 million to settle the shareholder lawsuits.

3440070v1(50538.13)

30.     Through the settlements and plea agreements that resolved the actions filed by the SEC, DOJ, and OSC, Biovail entered into consent decrees and plea agreements. The consent decrees and plea agreements reveal that the purported material facts it relied upon in the Lawsuits it filed against Plaintiffs were false.

31.     Despite acknowledging its wrongdoing, through the settlements and plea agreements, Biovail continued to pursue its baseless claims against Plaintiffs causing additional harm and damages.  Biovail's acknowledgement of responsibility through its pleas and consent judgments was completely inconsistent with the position it was taking in continuing to maintain the Lawsuits against Plaintiffs.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     THE NEW YORK SHAREHOLDER CLASS ACTION AND ACCOUNTING FRAUD

32.     Biovail's malicious prosecution of false lawsuits against Plaintiffs arises out of Biovail's and Biovail Pharmaceutical's chronic fraudulent and criminal conduct, including financial reporting fraud and other intentional public misrepresentations designed to conceal the corporation's poor earnings.

33.     In addition to its fraudulent and criminal conduct, Biovail and Biovail Pharmaceuticals also engaged in an aggressive and malicious litigation strategy in a desperate effort to conceal their fraudulent and criminal conduct and explain their poor earnings.  Plaintiffs were severely damaged as a result of this improper litigation strategy.

34.     In response to the significant drop in the price of Biovail stock during 2003, 13 class action complaints were filed in the United States District Court for the Southern District of New York in and after November 2003.

35.     The class actions were consolidated in March 2004 under the caption *In re Biovail Corporation Securities Litigation*.

- 6 -

36.     At this time, Biovail was also under investigation by the DOJ and SEC for the possible use of illegal marketing practices and the inflation of Biovail's share price before the 2003 decline.

37.     On June 18, 2004, the Lead Plaintiffs in the shareholder action filed a Consolidated Amended Class Action Complaint which generally alleged violations of the federal securities laws through, among other things, misstatements and omissions by Biovail in its public communications about Cardizem LA and Wellbutrin XL, and the projections that Biovail gave to financial analysts which were based upon the purported successful launches of those drugs.  A copy of the Consolidated Amended Class Action Complaint is attached hereto Exhibit A.

38.     The plaintiffs in *In re Biovail Securities Litigation* alleged, *inter alia,* that Biovail knowingly made false projections regarding the expected profitability of its Cardizem products, implemented the PLACE program with the intent to deceive investors, knowingly mislead investors with respect to the launch of Cardizem LA after February of 2003, and misrepresented the effects of a trucking accident on Biovail's third quarter earnings.

39.     Biovail unsuccessfully moved to dismiss the class action in 2004, and filed an Answer to the First Amended Complaint on February 4, 2005.

40.     As part of its response to the New York shareholder class action, Biovail fabricated a theory that conspirators took steps against Biovail to drive down its stock price by issuing false reports claiming that Biovail knowingly made false projections regarding the expected profitability of its Cardizem products, that Biovail's PLACE program improperly provided payments to physicians and others to encourage them to prescribe Cardizem LA, that Biovail knowingly mislead investors with respect to the launch of Cardizem LA, and knowingly misrepresented the effects of a trucking accident

- 7 -

on Biovail's third quarter earnings from Wellburtin XL.   In fact, the reports Biovail attacked were accurate and Biovail knew they were accurate when it hatched the conspiracy allegations.

41.     In effect, Biovail maintained that the claims its shareholders were asserting against it were unfounded, that the conspiracy had created false reports in 2003 and 2004 making these same unfounded claims, and that it was the actions of the conspiracy, not Biovail's improper acts and omissions, which were the cause of the decline in the stock price.

42.     Despite vigorously promoting its baseless conspiracy theory, in 2009 Biovail   settled *In re Biovail Securities Litigation* by paying $138,000,000.00 to the class action plaintiffs.  Biovail also agreed to adopt a series of changes to its rules of corporate governance.

3440070v1(50538.13)

## B.  BIOVAIL SCAPEGOATS GRADIENT AND OTHERS

### 1.  The New Jersey Lawsuit

43.     On February 22, 2006, Biovail instituted a lawsuit in New Jersey State Court against Gradient, Vickrey, and Bettis, alleging, *inter alia*, that Gradient participated in a conspiracy in violation of New Jersey's Civil Racketeer Influenced and Corrupt Organizations Act ("NJ RICO") to deliberately injure Biovail by issuing false reports referenced to in the Complaint as "hatchet jobs" for the purpose of causing a decrease in the price of Biovail shares of stock.  A copy of Biovail's Complaint is attached hereto as Exhibit B.

44.     Biovail's Complaint, filed in the Superior Court of New Jersey, Essex County, under Docket Number ESX-L-1583-06, is referred to herein as the *Biovail* Complaint.

45.     In the 202-paragraph *Biovail* Complaint, Biovail alleged, *inter alia*, that Gradient knowingly published ghost written negative reports about Biovail and manipulated the release date of the reports to allow Gradient's clients to profit by the decreased price of Biovail shares.  Biovail knew these allegations were false because it knew the reports were authored by Gradient, were accurate and that the reports did not affect the price of Biovail's stock.

46.     In addition to asserting that the Gradient reports were prepared in furtherance of a conspiracy, the Complaint falsely alleged that Gradient was a fraudulent business and made unsupported *ad hominem* attacks against Plaintiffs, Drs. Vickrey and Bettis.

3440070v1(50538.13)

47.     In the *Biovail* Complaint, Biovail also falsely alleged that Gradient was guilty of criminal activities, racketeering, and civil conspiracy.

48.     In the *Biovail* Complaint, Biovail also alleged that reports published by Gradient intentionally and materially misrepresented facts regarding Biovail's accounting and reporting practices.  In fact, Biovail knew when they made these allegations that Gradient's reports were accurate.

49.      Also in the *Biovail* Complaint, Biovail asserted claims against Pinnacle Investment Advisors, LLC, and Helios Equity Fund, LLC.

50.     Pinnacle Investment Advisors, LLC,  ("Pinnacle") is a company founded by Dr. Bettis founded, where Dr. Vickrey also served as an ad hoc advisor.  Pinnacle managed and advised hedge and mutual funds.

51.     Pinnacle was a registered Investment Advisor with the Arizona Corporation Commission and subsequently a registered Investment Advisor with the Securities and Exchange Commission.

52.     Dr. Bettis also co-founded a hedge fund called the Helios Equity Fund, LLC ("Helios"), which was managed by Pinnacle.

53.     Pinnacle and Helios were always separate entities from Gradient.

54.     However, in the *Biovail* Complaint, Biovail falsely alleged that Drs. Bettis and Vickrey improperly commingled their activities at Gradient with their actions for Pinnacle and Helios.  In fact, the stock selection procedures of Pinnacle, including those used in Helios, were distinctly separate from the report writing activities of Gradient.

55.     After making no effort to substantiate its claims against Pinnacle and Helios, Biovail ultimately dismissed them voluntarily.

56.     The *Biovail* Complaint falsely alleged that Drs. Vickrey and Bettis misrepresented Gradient's independence as a research firm.

- 10 -

57.    The *Biovail* Complaint falsely alleged that Gradient's service was "a sham," and that the representations regarding its independence were false.

58.    The *Biovail* Complaint falsely alleged that Gradient's reports were "not legitimate unbiased research" and that the reports did not reflect Gradient's actual opinions regarding the companies being reported on.

59.    The *Biovail* Complaint falsely alleged that Drs. Vickrey and Bettis improperly manipulated the timing of the release of Gradient's reports for their own personal financial gain, as well as the gain of other members of the fabricated conspiracy.

60.    The *Biovail* Complaint falsely alleged that Drs. Vickrey and Bettis were members of an illegal racketeering enterprise and that they violated their duties of fidelity to their clients and engaged in commercial bribery.

61.     None of the foregoing allegations against Gradient, Dr. Vickrey, or Dr. Bettis were true when they were made, and Biovail was aware they were false when the *Biovail* Complaint was filed.   Nonetheless, Biovail falsely made these allegations to protect itself from liability in the shareholders lawsuits and to cover up its own improper and illegal activity which was ultimately discovered and punished by the SEC, OSC and DOJ.

62.    Even after admitting wrongdoing and paying fines in those actions, Biovail maliciously continued to pursue these false allegations.

## 2.    The Public Relations Attack

63.     In addition to attacking Plaintiffs by filing suits, Defendants engaged in a public relations attack against Plaintiffs that was devastating to their business and to them personally.

3440070v1(50538.13)

64.     To carry out the attack, Biovail retained public relations professionals in order to secure press coverage for its fabricated conspiracy which was designed to provide an alternate explanation for the drop in the price of Biovail stock beyond Biovail's own improper conduct.

65.     Biovail's public relations attack reached it pinnacle when its fabricated conspiracy allegations were featured as the lead story on CBS' *60 Minutes* on March 26,2006.   During that broadcast, Biovail's then-Chairman and Chief Executive, Eugene Melnyk, appeared and recklessly and maliciously repeated many of the allegations contained in the *Biovail* Complaint, which both Melnyk and Biovail knew to be false. These allegations and the broadcast received extensive media coverage.

66.     During that broadcast, Melnyk repeated many false allegations specifically designed to harm Plaintiffs, including the allegation that "[t]here's a group of people that got together and essentially attacked the company by putting out false reports."

67.     Melnyk went on to claim that "[t]he damage that was suffered by the company we—we can attribute directly to the reports that came out."

68.     Melnyk went so far in 2006 as to claim "[t]here is virtually no analyst out there that thought that the stock was overvalued."

69.     The false and inflammatory *60 Minutes* episode was used by Biovail to promote its fabricated conspiracy theory.

70.     After the *60 Minutes* episode, Biovail continued its public relations attack by seeking and obtaining publicity for its fabricated conspiracy theory through numerous media outlets.

3440070v1(50538.13)

### 3.   Biovail Attacks Gradient With an Overzealous Investigation

71.   Upon information and belief, as part of its litigation strategy, Biovail also engaged private investigators to intimidate and harass the defendants identified in the *Biovail* Complaint, including Plaintiffs herein.

72.   Upon information and belief, this campaign of menace was initiated and orchestrated by Biovail's agent, private investigator James Holohan.

73.   James Holohan headed the KBTF Group LLC, an affiliate of the Kasowitz, Benson, Torres & Friedman law firm, the attorneys for Biovail in the *Biovail* litigation.

74.   The harassment of Plaintiffs included directing anonymous emails and letters, sent to their home residences, to current and former Gradient employees accusing Gradient of criminal activity and providing a return email or telephone number for them to contact to become "whistleblowers."

75.   On a number of occasions, Gradient analyst, Zach Shannon, the analyst who drafted the reports highlighting the improper accounting practices employed by Biovail, was contacted by telephone by James Holohan and other private investigators believed to be retained by Biovail.

76.   Holohan made threatening statements, including "if you do not cooperate, you will never work in the industry again" and "you better discuss this with your wife." This last comment was intended to threaten Shannon by advising him that his private life was also being investigated.

77.   Stephanie Hall, a senior analyst at Gradient, also received harassing telephone calls, including at least one call directed to her personal cellular telephone.

78.   Biovail's private investigators also accosted Shannon in person on multiple occasions.

- 13 -

3440070v1(50538.13)

79.     A number of other Gradient employees and former employees reported similar instances of harassment and intimidation, both before and after the *Biovail* complaint was filed.

80.     Biovail's private investigators also openly followed Plaintiff, Dr. Bettis, on numerous occasions in an effort to intimidate him and attempted to disrupt meetings between him and Gradient clients.

81.     Private investigators, believed to be associated with Biovail, also gained access to Gradient's offices by posing as a potential client while using a fake name and address.  They also arranged other meetings while misrepresenting their credentials and their real intent.

82.     Upon information and belief, Biovail's agents improperly accessed Gradient's website and improperly downloaded copyrighted materials.

83.     Upon information and belief, after the filing of the *Biovail* complaint, Biovail's agents conducted surveillance on Dr. Vickrey's home and attempted to intercept his electronic communications.

84.     The agents made their activities highly visible and intrusive so as to intimidate Dr. Vickrey and ensure that his neighbors were aware he was under some form of surveillance.

### 4.     Biovail Orchestrated the Filing of a False Class Action Complaint

85.     Shortly after the filing of the *Biovail* Complaint, Biovail orchestrated the filing of a purported class action in the United States District Court for the District of New Jersey by paying its lawyers to draft a complaint which was virtually identical to the *Biovail* Complaint, under the caption *Del Guidice v. S.A.C. Capital Management, LLC et*

*al*, (hereafter the *Del Guidice* Complaint).   A copy of the *Del Guidice* Complaint is attached hereto as Exhibit C.

86.    The purported class members for the *Del Guidice* Complaint were Biovail shareholders, and the Complaint sought the same damages as those sought in the New York shareholder class action against Biovail (*i.e.*, the lost value of the Biovail stock).

87.    Biovail's defense attorneys in the shareholder class action drafted the *Del Guidice* Complaint, which was virtually identical to the *Biovail* Complaint, and billed Biovail for the cost of preparing the lawsuit.   They then sent the Complaint to the purported lawyer for the class action plaintiffs who filed it less then 24 hours later with almost no changes or additional investigation.

88.    Biovail also paid its own public relations firm to draft press releases pertaining to the *Del Guidice* lawsuit.

89.    Upon information and belief, Biovail paid a second public relations firm to put its name on the press releases pertaining to the *Del Guidice* lawsuit, so that it would not be readily apparent that the suit and press releases had been prepared on behalf of Biovail.

90.    Despite the fact that the *Del Guidice* Complaint was ostensibly an independent class action complaint filed by independent Biovail shareholders, the complaint was actually drafted by, paid for, and publicized by Biovail as a further attempt to divert attention from its own fraudulent conduct and scapegoat others, including Plaintiffs, for the decrease in Biovail's stock price.

3440070v1(50538.13)

## C.   BIOVAIL'S CONTRIVED CONSPIRACY UNRAVELS AS THE PUBLIC AUTHORITIES ESTABLISH BIOVAIL HAS COMMITTED FRAUD

91.    After Biovail orchestrated the malicious lawsuits scapegoating Plaintiffs and others, Biovail's scheme fell apart when the SEC, OSC, and DOJ brought complaints against Biovail for accounting fraud and other improper activities confirming that it was Biovail's own misdeeds that caused its stock price to tumble rather then the fabricated conspiracy.

92.    Although it would not acknowledge its own wrongdoing while the various governmental agencies conducted their investigations, once charges were filed Biovail promptly resolved all of the complaints against it and thus acknowledged  its wrongdoing.

93.    The SEC filed a Complaint against Biovail and four of its officers alleging that Biovail repeatedly overstated earnings and hid losses in order to deceive investors and create the appearance of having achieved superior earnings.

94.    The SEC further alleged that Biovail engaged in a scheme to mislead investors about the company's performance between 2001 to 2003.  The scheme was advanced by:  (1) a transaction through which Biovail, over several reporting periods in 2001 and 2002, improperly moved off its financial statements and onto the financial statements of a special purpose entity, known as Pharmatech, the expenses incurred in the research and development of some of Biovail's products that totaled approximately $47 million through September 30, 2002 and related liabilities that exceeded approximately $51 million through that date; and (2) a fictitious bill and hold transaction that Biovail concocted to record approximately $8 million in revenue in the second quarter of 2003.

3440070v1(50538.13)

95.     Biovail did not answer the SEC's Complaint.   Rather, the day the Compliant was filed, the SEC announced that Biovail had entered into a consent decree agreeing to pay a $10 million fine to resolve the charges.

96.     Upon information and belief, the SEC is continuing to pursue charges against some of the individually named Biovail officers.

97.     The OSC filed a similar Statement of Allegations against Biovail and the same officers.

98.      The OSC asserted, *inter alia*, that Biovail failed to properly account for a special purpose entity, Pharmaceutical Technologies Corp. ("Pharmatech"), in 2002 financial statements; improperly recognized revenue in the second quarter of 2003 relating to a purported sale of Wellbutrin XL tablets; failed to correct and disclose on a timely basis a known material error in its 2003 financial statements; and made materially misleading statements relating to an October 1, 2003 truck accident involving a shipment of Cardizem LA.

99.     In January 2009, Biovail agreed to pay the OSC a $5 million fine plus costs of $1.5 million in order to settle the allegations of improper accounting, misleading the public, and making false statements to the OSC.

100.    Upon information and belief, this was the largest fine ever assessed by the OSC against a public company.

101.    Three of the individually charged officers also settled with the OSC.

102.    In May 2008, the DOJ brought criminal charges against Defendant, Biovail Pharmaceuticals, Inc., alleging that Biovail Pharmaceuticals conspired to pay illegal remunerations to physicians.

103.     Biovail Pharmaceuticals admitted criminal liability in connection with its improper marketing of Cardizem LA.

3440070v1(50538.13)

104.   Specifically, Biovail Pharmaceuticals pled guilty to conspiracy and kickback charges and paid a criminal fine in excess of $22 million for engaging in a program which paid up to $1,000 to thousands of physicians and others in order to induce them to prescribe and/or recommend the drug Cardizem, L.A.

105.   As part of its plea agreement with the DOJ, Biovail Pharmaceuticals admitted that it knowingly and willfully offered remuneration, in cash and in kind, to physicians and other medical prescribers in order to induce them to prescribe Cardizem, L.A. for their patients.

106.   Biovail Pharmaceuticals also admitted to having misrepresented that the PLACE program for the promotion of Cardizem, L.A., was a scientific study of the performance of Cardizem, L.A.   In fact, the PLACE program was designed to induce physicians to prescribe the product to their patients in return for monetary payments.

107.   In the agreement with the DOJ, Biovail Pharmaceuticals also admitted that between March 2003 and May 2003, Biovail Pharmaceuticals misrepresented that the PLACE program had been reviewed by attorneys to ensure compliance with the Anti-Kickback statutes, when, in fact, no such review had been performed.

108.   Officers of Biovail were aware that the above-described representations regarding alleged compliance with Anti-Kickback statutes were false.

3440070v1(50538.13)

109.   Moreover, Biovail's officers participated in advancing the misrepresentations.

**D.   BIOVAIL'S ACKNOWLEDGEMENT OF ITS ACCOUNTING FRAUD AND OTHER BAD ACTS CONFIRMS THAT GRADIENT'S REPORTS WERE ACCURATE AND THAT BIOVAIL'S ALLEGATIONS OF A CONSPIRACY WERE A MALICIOUS ATTEMPT TO COVER UP ITS OWN FRAUDULENT CONDUCT**

110.   Through the settlements, payments of fines, and guilty pleas described above, Biovail has acknowledged that the purported "facts" underlying the *Biovail* and *Del Guidice* Complaints and the conspiracy claims made against Plaintiffs were untrue, and that Biovail was aware that the claims against Plaintiffs were based on untrue facts when it filed the *Biovail* Complaint.

**1.   Biovail's Improper Accounting Procedures Involving Pharmatech**

111.   In mid 2001, Biovail sought to increase net income by removing from its books the research and development costs associated with a key mid-term product pipeline.  To achieve this goal, Biovail created a special purpose entity, Pharmatech, to carry those costs.

112.   Despite the fact that research and development costs were expected to be in the tens of millions of dollars, with some estimates as high as $120 million, Pharmatech's sole shareholder, whom Biovail secured, invested only $1 million in the company. Moreover, $350,000 of the investment was immediately returned to the investor as a fee.

113.   Biovail secured financing for Pharmatech from its own lender (the "Bank"), based on Biovail's assurances to the lender that, if the Bank chose not to renew the Pharmatech financing, Biovail would likely purchase Pharmatech and retire the debt.

114.   Biovail deliberately and fraudulently orchestrated the Pharmatech arrangement in order to avoid recording it in Biovail's books and records, and to avoid

3440070v1(50538.13)

reporting on its financial statements the expenses and liabilities related to the research and development of certain Biovail products.

115.    Biovail represented to the Bank it was probable that Biovail would repay Pharmatech's debt to the Bank when it first came due after one year, regardless of the outcome of the research and development at that point, if the Bank did not renew the financing.

116.    Biovail was aware that, under those circumstances, the United States General Accepted Accounting Principals ("GAAP") required Biovail to record Pharmatech's expenses and liabilities related to Pharmatech's research and development of the products and to include them on its own financial statements.

117.    Biovail deliberately did not recognize and record Pharmatech's liabilities or charge its research development costs to expense as incurred on Biovail's books and records and did not include them on Biovail's financial statements.

118.    Instead, Biovail intentionally misled Biovail's auditors as to the true nature of the arrangement in order to secure from the auditors an opinion letter supporting Biovail's accounting for the arrangement.

119.    At the conclusion of the initial year of financing, in June 2002, the Bank extended Pharmatech's financing but only for six more months, until December 31, 2002.

120.    As early as October 2002, Biovail's management realized that the Bank would neither renew the credit facility on December 31, 2002 nor increase its limit, and, on December 24, 2002, Biovail learned definitively that the Bank would not extend any additional funds to Pharmatech.

121.    Three days later, Biovail sent a letter notifying the sole Pharmatech stockholder that Biovail intended to exercise the purchase option.

3440070v1(50538.13)

122.   Consistent with the representations that Biovail had made to the Bank, Biovail bought Pharmatech when the Bank decided not to extend additional financing and repaid the Bank in full.

123.   Biovail's actions confirmed that its intention was always to exercise its purchase option and repay the Bank if the credit facility was not extended.

124.   Biovail's interim financial statements for the quarter ended September 30, 2001, for the nine months ended September 30, 2001, for the quarter ended March 31, 2002, for the quarter ended June 30, 2002, and for the quarter ended September 30, 2002, all certified that they "fairly present[ed], in all material respects, the financial condition and results of operations of the Company," when Biovail knew or recklessly disregarded that this representation was materially false and misleading.

125.   As a direct result of Biovail's intentional failure to record on its books and records a total of approximately $47 million in Pharmatech's expenses and more than approximately $51 million in liabilities related to the research and development through September 30, 2002, Biovail's financial statements were materially misstated.

126.   In addition, during the fourth quarter of 2002, Biovail did not charge to expense as incurred more than $10 million in additional Pharmatech expenses and did not timely recognize and record on Biovail's books and records additional related liabilities that Pharmatech incurred during that quarter.

127.   Biovail's financial reports were materially false and misleading in that they did not include Pharmatech's research and development expenses, causing: (1) net income to be overstated by approximately 50% in the third quarter 2001, 32% in the 2001 annual financial statements, 15% in the first quarter 2002, 18% in the second quarter 2002, and 16% in the third quarter 2002; and (2) net income excluding certain charges to be overstated by approximately 25% in the third quarter 2001, 12% in the 2001 annual

3440070v1(50538.13)

financial statements, 16% in the third quarter 2002, and 17% in the 2002 annual financial statements.

128.   Biovail's balance sheets included in the financial reports also were materially false and misleading because they did not include Pharmatech's liability to the Bank, causing Biovail's total liabilities to be understated by approximately 2% in the third quarter 2001, 11 % at year-end 2001, 5% in the first quarter 2002, 5% in the second quarter 2002, and 7% in the third quarter 2002.

129.   Biovail knew that the financial statements identified above were materially false and misleading.

### 2.   Gradient's Reports Uncovered the Pharmatech Accounting Issues

130.   Gradient issued a number of reports about Biovail that included opinions regarding Pharmatech and other similar off-balance sheet entities.

131.   A March 11, 2003 Gradient Report opined:

As a result of two fourth-quarter acquisitions ..., [Biovail] took a $167.7 million in-process research and development (IPR&D) charge, representing 21.3% (191.1%) of revenues (net income) in 2002.  While an immediate write-off of any acquired research and development is required by GAAP, the amount of the charge represents a material portion of the total price paid for both acquisitions.  IPR&D associated with [Pharmatech] totaled approximately $100 million, or 52.6% of the $190 million purchase price.  ... Due to the subjectivity permitted in the projection and discounting of cash flows associated with IPR&D, management has ample room to write down assets that would otherwise require amortization in future periods. Furthermore, IPR&D charges are essentially ignored by the company and other analysts as 'nonrecurring' and excluded from earnings per share, allowing a firm to boost future earnings without adversely impacting the current share price.  Thus, we are concerned that BVF may have used the recent IPR&D write-offs as a means of boosting future earnings.

132.   A June 20, 2003 Gradient report again questioned the propriety of Biovail's accounting practices pertaining to the acquisition of Pharmatech, and opined that Biovail had "succeeded in shifting R&D off-balance sheet, while simultaneously recording revenue from the underlying transactions."

133.   A September 16, 2003 Gradient report opined: "BVF has twice used off-balance sheet entities to conduct R&D, while simultaneously recognizing revenue from these related parties. Thus, what would ordinarily be categorized as an expense was instead reported as revenue, offsetting any related expenses."

### 3.   Biovail's Sham Bill and Hold Transaction Involving Wellbutrin XL

134.   On February 7, 2003, Biovail published earnings guidance for its fiscal year 2003. It projected second quarter earnings per share between $0.43 and $0.50, third quarter earnings per share between $0.58 and $0.68, and annual sales of Wellbutrin XL of between $75 million and $150 million.

135.   Wellbutrin XL was a key component of these earnings projections.  It was widely expected that Wellbutrin XL would be the most significant product launch in Biovail's history.

136.   The product, however, could not launch until it received FDA approval.

137.   By early June 2003, the FDA still had not yet approved Wellbutrin XL. Biovail executives became concerned because it was clear that Biovail would not meet its second quarter earnings projections unless it was able to sell Wellbutrin XL trade product by June 30.

138.   Although Biovail needed to produce, prior to FDA approval, enough Wellbutrin XL "trade" product (*i.e.*, product for sale) to enable the distributor to launch the product promptly, it was risky to manufacture too many pills before the FDA had

determined as part of the approval process what the product's shelf life would be because the distributor could return stale pills to Biovail.

139.    However, "sample" product could be given away rather than sold.  As a result, it could be distributed until expiration and therefore did not have the same shelf life concerns as the trade product

140.    In April and May 2003, Biovail's distributor for Wellbutrin XL submitted purchase orders for the delivery of Wellbutrin XL sample pills in June and for delivery of trade product (contingent on FDA approval of the trade product packaging) in July.

141.    There were two reasons why the distributor sought delivery of sample pills before trade pills: (1) under the agreement, the distributor was responsible for packaging sample pills and wanted sufficient quantities on hand early so it could prepare for the launch; and (2) there was a risk that trade pills could expire unused if they were produced too early.

142.    By the middle of June 2003, Biovail had not filled the distributor's pending orders for sample product.

143.    At the time, Biovail was experiencing manufacturing problems and, as a result, was unable to manufacture sufficient quantities to fill the sample orders.

144.    In addition, filling sample orders generated no income for Biovail.

145.    If Biovail had invoiced and shipped the inventory as samples during June, it would have sustained a loss because the cost of goods sold exceeded the contractual sample prices.

146.    Even though Biovail knew about the production problems, Biovail pressured the distributor to place an order for trade product for June delivery so that Biovail could be assured that it could book the revenue associated with those shipments of trade product in second quarter of 2003.

3440070v1(50538.13)

147.   The distributor acquiesced to Biovail's demand for a June order for trade product in view of Biovail's threat to turn its manufacturing capacity to other products, which could have caused a delay in the Wellbutrin XL launch.

148.   On June 20, 2003, the distributor placed an order for 27.1 million tablets of trade product.

149.   Since FDA approval was still pending, Biovail could not label the product. As a result, the Distributor agreed to let Biovail hold the product awaiting FDA approval and packaging.

150.   Although Biovail had not manufactured enough pills to meet the order, it purported to earmark the entire then-existing inventory of Wellbutrin XL in its warehouse, approximately 18 million pills, to fill this "bill and hold" order.

151.   On June 30, 2003, Biovail invoiced the distributor approximately $8 million for the product, and recorded a sale at a price that was slightly reduced from the usual trade prices to reflect that the packaging would not be done or invoiced until after FDA approval.

152.   The parties did not agree, however, on a fixed schedule for delivery of the product because the date of FDA approval was not yet known.

153.   Under GAAP, revenue may be recognized when it is realized or realizable and earned. Among other things, this requires that the seller's price to the buyer be fixed or determinable.

154.   With respect to the sale of a product like Wellbutrin XL, revenue may be recognized when delivery of the product by the seller to the buyer has occurred.

155.   Although the bill and hold transaction was not genuine, one requirement in particular that was plainly and deliberately flouted was that the ordered goods must have

been segregated from the seller's inventory and not be subject to being used to fill other orders.

156.   Indeed, the goods supposedly sold in the sham bill and hold transaction and segregated in the warehouse on June 30, were very soon thereafter designated by Biovail to fill the distributor's pending orders for sample product and were shipped with new invoices at different and much lower prices -the sample prices.

157.   Although no one knew prior to FDA approval what the expiration date for trade product would be, Biovail knew in June that all of the tablets then in Biovail's inventory, which were supposedly sold to the distributor in the purported bill and hold transaction, were already at that time too old for trade use.

158.   To avoid potential returns of such stale pills by the distributor, and in an attempt to fill the distributor's orders for sample pills that had been pending since April, Biovail – no later than mid-July, before the close of Biovail's second quarter books – designated for shipment to the distributor as sample product (under sample invoices at the lower sample prices) the very same pills that Biovail supposedly had designated and segregated for the purported on June 30 bill and hold transaction and for which Biovail had invoiced the distributor at the higher contractual trade prices.

159.   Biovail then invented a rationale by which Biovail purportedly could still recognize the trade sale revenue in the second quarter.  Biovail decided to replace the pills that would now be shipped as sample pills at the lower sample prices with newer pills that would now become the subject of the June 30 sale.

160.   However, as of June 30, replacement pills did not exist because they had not yet been manufactured.

161.   By July 18, Biovail sent the distributor various schedules showing that Biovail intended to ship to the distributor under sample invoices and at the lower sample

prices the very same pills that were the subject of the June 30 trade sale invoices at the higher, trade prices.

162.   Biovail led its outside auditors to understand that a trade shipment had actually occurred on June 30, which was not true.

163.   Biovail also falsely told the auditors in connection with their quarterly review that pricing on the June 30 trade product sale was fixed even after Biovail had decided to ship the same pills supposedly sold in that transaction to the distributor at the lower sample prices.

164.   Moreover, in mid-July, when Biovail designated for shipment the purportedly segregated goods to fill the sample orders, Biovail still had not yet manufactured the additional pills that supposedly would replace them for the June 30 trade product sale.

165.   Thus, there were not sufficient pills in existence to apply to that sale once Biovail designated the purportedly segregated goods for shipment to fill the pending orders for sample pills.

166.   In late July, Biovail closed its books on the second quarter still recognizing improperly the approximately $8 million in revenue in connection with the June 30 trade product sale.

167.   On July 29, 2003, Biovail issued an earnings release for the quarter ended June 30, 2003.

168.   When Biovail closed its books for the quarter ended June 30, 2003 and when it announced its second quarter results on July 29, 2003, it knew, or recklessly disregarded, that the requirements under GAAP for revenue recognition for a bill and hold transaction were not satisfied with respect to the Wellbutrin XL trade product sale transaction that purportedly occurred on June 30, 2003.

- 27 -

169.   Specifically, Biovail knew among other things, that:   (1) as of June 30, 2003 there was no fixed schedule for delivery of the goods; (2) the distributor had not agreed to pay the higher prices for trade product if it was shipped and used as sample product; (3) the pills supposedly segregated for the June 30, 2003 trade sale comprised all of Biovail's Wellbutrin XL tablets as of June 30, 2003; and (4) insufficient quantities of other pills existed as of June 30 or when Biovail's second quarter books were closed in July to replace the supposedly segregated pills once Biovail designated them for shipment to the distributor to fill the distributor's other pending orders for sample product at the lower sample prices.

170.   As a direct result of the improper recognition of revenue on the phony bill and hold transaction, the July 29, 2003 earnings release was intentionally and materially false and misleading.

171.   Specifically, the earnings release understated the Company's net loss for the quarter by approximately 80% and overstated the company's net income (excluding acquired R&D) for the quarter by about 5%.

172.   Through the foregoing manipulations, Biovail's announced earnings appeared to meet its earnings guidance for the second quarter.

173.   During August 2003, after the distributor began receiving the shipments of sample product, the distributor notified Biovail that, because the August sample invoices identified the same tablets that were associated with the June 30 trade invoices, the distributor would not process the June 30 trade invoices at that time.

174.   By no later than August 29, 2003, Biovail knew that during August, the distributor had refused to process the June 30 invoices for the trade product sale because Biovail was shipping the same pills under sample invoices at the lower sample prices.

- 28 -

175.    Nevertheless, on August 29, 2003, Biovail furnished to the SEC on Form 6-K Biovail's second quarter financial statements that were intentionally and materially false and misleading.

176.    As a direct result of the improper recognition of revenue on the phony bill and hold transaction, Biovail's net loss was understated by approximately 80%.

177.    Biovail knew that the financial statements were intentionally and materially false and misleading because the revenue recognition on the purported June 30 trade product sale included in the second quarter financial statements was not in accordance with GAAP.

178.    Biovail failed to inform its auditors that the distributor was refusing to pay the June invoices because Biovail had shipped to the distributor the very same pills under two different invoices, the available pills were aged and best used as samples to avoid returns, and the distributor did not agree to pay trade prices if it used the pills as sample product.  Biovail also falsely told the auditors in February 2004 during the year-end audit that the distributor's non-payment had nothing to do with the phony bill and hold transaction.

179.    On September 1, 2003, Biovail issued two credit memos to the distributor voiding the two unpaid June 30 trade invoices.

180.    Biovail also mislead the auditors in early 2004 about the true reason for the September 1, 2003 credit memos.  Biovail falsely asserted to the auditors that the company had credited out the old invoices so that it could issue new invoices that included packaging costs.

181.    The truth was that the distributor had refused to pay the June 30 invoices, and two sets of invoices could not have duplicate lot numbers on them.

3440070v1(50538.13)

182.   Biovail's annual report for the year ended December 31, 2003 continued to reflect the approximately $8 million in revenue and about $4 million in earnings from the phony June 30 bill and hold transaction.

### 4.   Gradient's Reports Uncovered the Sham Bill and Hold Transaction

183.   During 2003, Gradient issued a number of reports which addressed, in part, the problems Biovail was experiencing in collecting accounts receivable that resulted, in part, from the sham bill and hold transaction and double billing for the same goods.

184.   Gradient specifically noted:

The quality of [Biovail's] accounts receivable continued to deteriorate in the third quarter of 2003, as the 72.1% increase in receivables vastly outpaced the 18.6% boost in sales for the twelve month period ended 09/30/03. As a result, net receivables represented 27.5% of revenues at 09/30/03, up from 19.0% a year earlier and 16.6% at year-end 2001. The disturbing trend of increased receivables at [Biovail] has been accompanied by a corresponding decline in turnover metrics. Specifically, the company's receivables turnover metric dropped 36.4% year-over-year to 4.089 turns per annum during the most recent twelve months; similarly, the average collection period soared 57.3% over the same time frame, up from 56.8 to 89.3 days.

185.   Gradient also opined that, "the unusual increase in receivables, potentially inadequate allowance for doubtful accounts and declining turnover suggest that the quality of receivables is well below average. Consequently, we are concerned that there is an increased risk of future charges (against earnings) that may be necessary to write down the carrying value of receivables." In fact, Biovail subsequently issued the two credit memos to reverse out the revenues that had been improperly recognized.

186.   Among the techniques used by Gradient to identify the potential fraud was a set of ratios designed by a highly regarded accounting professor specializing in methods

- 30 -

of detecting financial statement fraud. Gradient's reports specifically addressed the implications of that analysis by stating:

> "We are also concerned about the extreme value of the firm's days in sales index (a measure of the change in the ratio of accounts receivable to sales from one period to the next). This crucial metric rose to 1.464 in 2002, approximately equal to the mean level of the index for firms that <u>had</u> manipulated earnings in an academic study conducted by Professor Messod D. Beneish (*Financial Analysts Journal*, Sep./Oct. 1999)."

187.   Gradient's observations in 2003 about Biovail's problems with accounts receivable and the probability of financial fraud were accurate when they were made. The subsequent settlement of actual charges brought by the SEC and OSC further confirmed the validity of Gradient's analysis.

### 5.   Biovail's Misrepresentations Regarding the October 2003 Truck Accident

188.   On October 1, 2003, a truck containing a shipment of Biovail's Wellbutrin XL was involved in a motor vehicle accident on route to a distributor.

189.   On October 3, 2003, Biovail unexpectedly issued a press release and convened a conference call to announce it had significantly missed its third quarter earnings projections.

190.   Biovail's press release and public statements claimed the truck accident caused Biovail to report a substantial revenue shortfall for the third quarter of 2003 in the amount of $10 million to $20 million, or about 23% to 38% of the total announced revenue shortfall for the quarter.  Biovail also falsely claimed that the truck accident was responsible for its third quarter 2003 earning shortfall.

191.   The press release and other repeated public statements were materially false and misleading.  In fact, the truck accident had no impact on Biovail's financial results for the quarter.

3440070v1(50538.13)

192.   In addition, in the press releases and other public statements, Biovail grossly overstated the revenue value of the shipment involved in the truck accident.

193.   Under GAAP, revenue may be recognized on the sale of a product like Wellbutrin XL when, among other things, delivery of the product by the seller to the buyer has occurred.

194.   Pursuant to Biovail's agreement with the Distributor, all deliveries of Wellbutrin XL were subject to the term "F.O.B., [the Distributor's] facilities in the U.S.A. (freight collect)."

195.   This "F.O.B. Destination" delivery term meant that delivery occurred, and Biovail's revenue recognition would have been appropriate, only when the product reached the distributor's facilities in the United States.

196.   Under the FOB Destination shipping term, the truck accident had no impact on Biovail's third quarter financial results because the truck left Manitoba on September 30, which was too late for it to reach the distributor's North Carolina facility prior to the end of the quarter. Under those circumstances, Biovail could not have recognized revenue resulting from the shipment regardless of the accident.

197.   Nevertheless, Biovail repeatedly and falsely attributed its third quarter revenue shortfall to the truck accident.

198.   On October 3, 2003, Biovail issued a press release announcing that its third quarter 2003 "revenues [would] be below previously issued guidance and will be in the range of $215 million to $235 million and earnings per share of $0.35 to $0.45."

199.   The revenues were below the guidance Biovail had issued in February 2003 by about $45 million to $65 million, and the earnings per share range were below the February estimate by $0.23 at both ends of the range.

- 32 -

200.   This was the first time that Biovail had ever failed to meet its quarterly guidance.

201.   The October 3 release falsely attributed a significant part of the revenue shortfall to the truck accident by stating: "Contributing significantly to this unfavorable variance was the loss of revenue and income associated with a significant in-transit shipment loss of Wellbutrin XL as a result of a traffic accident."

202.   The October 3 press release also grossly overstated the revenue value of the Wellbutrin XL shipment involved in the accident claiming: "Revenue associated with this shipment is in the range of $10 to $20 million."

203.   Biovail knew that the true value of the product on the truck involved in the accident was approximately $5 million, however it nevertheless falsely inflated the value of the product as $10 to $20 million in the press release.

204.   Biovail knew that the statement in the October 3 press release concerning the value of the product involved in the truck accident was materially false and misleading.

205.   Later on October 3, in a conference call with analysts, Biovail falsely stated: "This accident will have a negative financial impact on Biovail's third quarter revenues."

206.   On the same call, Biovail referred to the value of the shipment as "$15 million to $20 million," three to four times the actual revenue value.

207.   On October 8, an employee at the distributor called and emailed Biovail for the purpose of correcting some of the misstatements in the October 3 press release and conference call, particularly with regard to the delivery terms for the shipment.

3440070v1(50538.13)

208.   Biovail issued a second press release that announced the recovery and salability of the product involved in the accident and "re-confirm[ed] that the sales value of these goods is within previously stated guidance."

209.   The October 8 press release was deliberately and materially false and misleading. Biovail knew that the truck accident had no impact on third quarter revenues.

210.   Biovail also knew that the statement in the October 8 press release reconfirming the October 3 guidance concerning the value of the product involved in the accident was materially false and misleading because it knew that the value in the October 3 press release was deliberately overstated.

211.   Banc of America Securities analyst, David Maris, published a research note on October 8, 2003 raising questions about Biovail's disclosures relating to the truck accident, specifically questioning whether Biovail overestimated the amount of Wellbutrin XL on the truck.

212.   Biovail's stock price dropped approximately $4 per share on October 8, 2003.

213.   On October 10, 13, 14, and 15, 2003, Biovail executives Eugene Melnyk, Brian Crombie, and Kenneth Howling conducted a road show in New York, Boston, and other cities to meet with market analysts and investors.

214.   During the road show, the Biovail executives talked about, among other things, the matters discussed in Biovail's October 3, 2003 press release.

215.   The road show presentation included slides that represented falsely that the truck accident's impact on Biovail's third quarter 2003 revenue was $10 to $20 million.

216.   In addition to the slides, the executives at the road show provided commentary reiterating the false statements in the October 3 press release.

217.   At the time of these misstatements, Melnyk, Crombie, Howling, and Biovail all knew that the statements attributing part of the third quarter revenue shortfall to the truck accident were materially false and misleading.

218.   On March 3, 2004, in its annual earnings release, Biovail finally acknowledged that the revenue associated with the product involved in the truck accident was only about $5 million rather than the $10 to $20 million previously stated on October 3, 2003.

219.   Even this release, however, did not acknowledge that the truck accident had no impact on Biovail's third quarter revenues.

220.   Biovail's stock price declined on March 4, 2004

### 6.   Gradient's Reports Accurately Dismissed the Impact of the Truck Accident

221.   In an October 7, 2003 Gradient Bulletin, Plaintiff Gradient reported:

Shares of Biovail Corporation (BVF) – featured in six separate Reports, Alerts and Watch List entries issued since December 18, 2002 – are down 43.3% since reaching an intraday high on June 8, 2003.  The firm's fortunes took a turn for the worse last Friday (October 3) when the stock did not open until approximately 12:15 P.M. Eastern Daylight Time, as trading was halted in the morning due to pending news. After opening, the firm's share price immediately fell 17.7%, then declined an additional 7.7% on Monday (October 6). The news, revealed in a conference call and a company press release, disclosed that BVF was reducing its third-quarter revenue guidance – three days after the close of the company's quarter – to a range of $215 million to $235 million as opposed to a previously announced range of $260 million to $300 million.

222.   The Gradient Bulletin included a discussion of areas of concern about Biovail's failure to meet its earning projection, including a discussion of Biovail's claims regarding the Wellbutrin XL shipment.

- 35 -

223.   Specifically, the October 7, 2003 Gradient Report stated:

Digging deeper beyond the information provided by management, we remain concerned about BVF's quality of earnings for several reasons. First, the nature and timing of the recent announcement strikes us as highly unusual. First, the fact that the company had expected to book $15-$20 million in Wellbutrin XL sales (i.e., as much as 2/3 of anticipated sales for the quarter) on the last day of the quarter suggests that the firm was struggling to meet guidance for the quarter even before the unfortunate event occurred. Second, the fact that the company has had to essentially reverse Prilosec royalties reported in an earlier period (due to retroactive price reductions) indicates that management at BVF or one of its partners may have been extremely aggressive in recording sales of the drug – by either overstating the price per unit expected to be received or by stuffing the channel (and retroactively reducing the price to coerce distributors into keeping the excess product).  Third, none of the issues addressed in our earlier reports have been addressed to date.

224.   In an October 30, 2003 Gradient Bulletin, Gradient observed:

From our perspective, the most interesting aspect of today's call was management's attempt to address quality of earnings concerns. … As noted in our Bulletin dated 10/07/03, BVF lowered third-quarter revenue guidance from a range of $260-$300 million to between $215 million and $235 million due primarily to a traffic accident (which occurred on 10/02/03) involving up to $20 million in Wellbutrin. While some analysts have questioned the accuracy of the loss figures reported by BVF management, we believe that the greater concern is a high likelihood of channel stuffing.  In this context, the truck left Manitoba on September 30, just barely placing the Wellbutrin sales – representing as much as 2/3 of anticipated sales for the quarter – in Q3.

225.   The October 30, 2003 Gradient Bulletin concluded, "[T]here remains a high level of risk that BVF will continue to engage in aggressive accounting. Consequently, we reiterate our Earnings Quality Grade of 'F' pending a more detailed report that we anticipate publishing next week."

### 7.   Illegal Payments to Drive Prescriptions of Cardizem, L.A.

226.    In late 2002, Biovail and Biovail Pharmaceuticals were preparing to introduce a new product Cardizem, L.A. to the market.

227.    As part of their promotion of the product Biovail and/or Biovail Pharmaceuticals implemented a program known as the PLACE program to generate prescriptions for the new product.

228.    The PLACE program paid physicians and other prescribers up to $1,000 for enrolling patients in the program, causing physicians to write a record number of prescriptions for Cardizem, L.A.

229.    To enroll a patient in the program, a physician or other medicine prescriber was required to do little more than write a 30-day prescription for the patient and the patient had to fill the prescription.

230.    The PLACE program also made payments directly to office assistants of physicians and other prescribers in order to induce the physicians' offices to write more prescriptions for Cardizem LA .

231.    The payments to the physicians and other prescribers, as well as to the office assistants, exceed the reasonable fair market value of their services.

232.    Biovail also falsely represented to independent sales agents that its program complied with anti-kickback legislation and the program had been reviewed by attorneys.

233.    In fact, the program had not been reviewed by attorneys and Biovail's management knew that the program was noncompliant.

> **8.    Gradient and Others Raise Concerns Regarding Biovail's Conduct in Paying Doctors to Prescribe Drugs in the PLACE Program**

234.    Biovail and Biovail Pharmaceuticals ignored concerns raised by third parties that the PLACE program violated the Anti-Kickback Act.

235.   At all relevant times, Biovail and Biovail Pharmaceuticals were prohibited by federal law from knowingly and willfully offering to pay any remuneration, directly or indirectly, to any person to induce that person to arrange or recommend purchasing any item for which payment may be made under a federal health care program.

236.   On July 21, 2003, newspapers, including the *Wall Street Journal*, ran articles captioned "Biovail pays doctors to prescribe new drug."

237.   On July 21, 2003, newspapers, including the *Wall Street Journal*, questioned whether Biovail's PLACE program was proper.

238.   In a July 31, 2003 Brief Report, Gradient observed, "The discovery of a program designed to pay doctors for prescribing Cardizem LA does not affect the company's quality of earnings, though it calls into question the motivation and integrity of management."

239.   The July 31, 2003 Brief Report further noted:

On July 21, 2003, the Wall Street Journal reported that BVF had been paying as much as $1,000 to doctors who prescribe Cardizem LA.  BVF defended the program, which it named PLACE (Providing LA through Clinical Experience), by labeling it a clinical experience program used to gather patient research.  In a recent conference call, the company revealed that approximately 17,000 doctors enrolled, which means that the potential liability may be in excess of $17.0 million, not including the $150 fee paid to office managers for their assistance in the program.  When contacted by our analyst, a BVF spokesperson indicated that the cost is expensed immediately, which appears the appropriate treatment for such a program.  Therefore, assuming that the company representative was truthful, we do not feel that the program significantly impacts quality of earnings, although it amplifies our concerns regarding the integrity of management and the effectiveness of the firm's corporate governance structure.

240.   In May 2008, the DOJ brought criminal charges against Defendant Biovail Pharmaceuticals, Inc., alleging that Biovail Pharmaceuticals conspired to pay illegal

remunerations to physicians.

241.   Biovail Pharmaceuticals admitted criminal liability in connection with its improper marketing of Cardizem LA. Specifically, Biovail Pharmaceuticals pled guilty to conspiracy and kickback charges and paid a criminal fine in excess of $22 million for engaging in a program that willfully offered improper remuneration, in cash and in kind, to physicians and other medical prescribers in order to induce them to prescribe Cardizem, L.A. for their patients.

242.   Biovail Pharmaceuticals also admitted to having misrepresented that the PLACE program for the promotion of Cardizem, L.A., was a scientific study of the performance of Cardizem, L.A.  In fact, the PLACE program was designed to induce physicians to prescribe the product to their patients in return for monetary payments.

### E.   THE ALLEGATIONS IN THE BIOVAIL COMPLAINT ARE FALSE AND BIOVAIL KNEW THEY WERE FALSE

243.   As part of its litigation strategy in response to the class action lawsuit and inquiries by the SEC, OSC and DOJ, Biovail developed a "conspiracy theory" defense wherein Biovail claimed that the decreases in the price of Biovail stock were not the result of improper actions on Biovail's part, but were instead the result of a vast conspiracy to manipulate the price of Biovail stock.

244.   It is patently obvious that at the time it made these allegations that Biovail was aware that its conspiracy theory was baseless and that the decreases in the price of Biovail stock were caused by its own acts as alleged by the shareholders in the New York class action, and subsequently by the SEC, OSC and DOJ investigations.

245.   Biovail asserted in the *Biovail* Complaint that a June 2003 report prepared by Gradient on Biovail "misrepresented without any factual basis that Biovail has a

3440070v1(50538.13)

history of 'aggressive accounting' that materially altered the firm's reported financial performance by shifting profits to the current period (at the expense of future periods.)"

246.    The statements in the June 2003 report about Biovail's accounting practices were true when they were made and Biovail was aware of the truth of the statements when it filed its complaint in 2006.

247.    The *Biovail* Complaint alleged that a June report prepared by Gradient on Biovail "misrepresented without any reasonable factual basis that Biovail used its 'substantial discretion' in accounting for in-process R&D to manipulate earnings …"

248.    The statement in the June 2003 report about Biovail's accounting practices was true when it was made and Biovail was aware of the truth of the statement when it filed its complaint in 2006.

249.    The *Biovail* Complaint further alleged that Gradient falsely reported that Biovail was pursuing a program to "pay doctors for prescribing Cardizem LA."

250.    The foregoing statement about Biovail's practices was true when it was made and Biovail was aware of the truth of the statement when it filed the *Biovail* Complaint in 2006.

251.    The *Biovail* Complaint further alleged that a July 31, 2003 Gradient report "misrepresented without any reasonable factual basis that Biovail's reported earnings per share were 'vastly overstated' and 'artificially inflated.'"

252.    The statement in the July 2003 report about Biovail's reported earnings was true when it was made and Biovail was aware of the truth of the statement when it filed its complaint in 2006.

253.    Biovail knowingly overstated it first quarter and second quarter 2003 net income by over $4 million.

- 40 -

254.    Biovail knowingly overstated it third quarter 2003 net income by over $8 million.

255.    Further, Biovail knowingly failed to correct the errors in its 2003 Financial Statements in a timely fashion.

256.    Biovail intentionally sought to conceal weak second quarter 2003 performance by intentionally failing to record approximately $3.9 million in losses due to foreign currency fluctuations.

257.    As a result of Biovail's willful refusal to make proper adjustments to account for foreign currency fluctuations, Biovail's second quarter 2003 net loss was understated by approximately 80%.

258.    Biovail further knowingly misrepresented that the financial statements for its reports for the first and second quarters of 2003 were prepared in accordance with GAAP when they were not.

259.    The *Biovail* Complaint further alleged that a September 16, 2003 Gradient report "misrepresented without any reasonable factual basis that expanding inventory levels reflected a 'risk of obsolete inventories' when in fact it reflected the build-up on inventory for Biovail's new product launches."

260.    The statement in the September 2003 Gradient report about Biovail's inventory was true when it was made and Biovail was aware of the truth of the statement when it filed its complaint in 2006.

261.    As described more fully above, Biovail engaged in a "Pill switch" scheme in July 2003 to address a problem with millions of pills of Wellbutrin XL which had a limited shelf life.

262.    These pills with a limited shelf life were not approved for packaging and sale by the FDA until August 28, 2003.

- 41 -

263.   Biovail misrepresented in second quarter 2003 Press Release that it had supplied millions of Wellbutrin XL tablets to its distributor in the second quarter when in fact the tablets were not shipped until August 2003.

264.   The *Biovail* Complaint further alleged that an October 30, 2003 Gradient report falsely accused Biovail of intentionally misreporting Biovail's shipments of Wellbutrin XL as channel stuffing.

265.   The statement in the October 2003 report about Biovail's practices was true when it was made and Biovail was aware of the truth of the statement when it filed its complaint in 2006.  In fact, as described more fully above, Biovail used threats to induce its distributor to take on additional shipments of product that it would not have ordinarily ordered at that time.

266.   Biovail improperly reported in the second quarter of 2003 a purported sale of Wellbutrin XL, thus improperly increasing Biovail's operating income by approximately $4.4 million.

267.   Biovail did not, in fact, segregate the Wellbutrin XL tablets at issue nor did it possess a sufficient quantity of product to fulfill the order.

268.   Biovail misrepresented the transaction to its auditors by falsely claiming that the company had shipped the trade order for Wellbutrin XL to its distributor, when in fact it had not.

269.   Biovail's accounting procedures violated both Canadian and U.S. GAAP.

270.   The *Biovail* Complaint further alleged that Gradient participated in misrepresentations regarding an alleged accident involving a shipment of Wellbutrin XL.

271.   The representations about Biovail's shipment of Wellbutrin XL were true when they were made and Biovail was aware of the truth of the statements when it filed the *Biovail* Complaint in 2006.

3440070v1(50538.13)

272.   Biovail issued an October 3, 2003 Press Release asserting that its third quarter 2003 preliminary results would be below expectations, in part, due to a loss of revenue and income associated with a significant in-transit shipment loss of Wellbutrin XL as a result of a traffic accident.

273.   Biovail's October 3, 2003 Press Release was materially misleading because the revenue associated with the shipment of Wellbutrin XL could not have been realized in the third quarter of 2003 and was unrelated to Biovail's failure to meet its previously issued revenue guidance.

274.   Further, Biovail's representation in the October 3, 2003 Press Release that the value of the revenue of the shipment was in the range of $10 to $20 million was untrue.

275.   Biovail was later forced to disclose that the actual revenue loss from the shipment was $5 million.  Even then, however, Biovail failed to acknowledge that the truck accident had no impact on its third quarter 2003 financial results.

276.   During an October 3, 2003 Analyst Call, Biovail repeated the materially misleading statements about the shipment.

277.   Biovail repeated again its misrepresentations about the shipment in both an October 8, 2008 Press Release and an October 30, 2008 Press Release.

F.   **DESPITE THE FACT THAT IT PUBLICLY ACKNOWLEDGED ITS ACCOUNTING FRAUD, BIOVAIL FAILED TO DISMISS THE MALICIOUS LAWSUITS AGAINST PLAINTIFFS AND OTHERS**

278.   United States District Court Judge Stanley R. Chesler, the Judge in the *Del Guidice* matter, pursuant to the Securities Litigation Uniform Standards Act, stayed all discovery in the state court *Biovail* action pending the outcome of anticipated motions to dismiss.

279.   In the *Del Guidice* matter, it was determined that Biovail improperly used documents obtained by subpoena in *In re Biovail Securities Litigation,* which were subject to a protective order, to draft both the *Biovail* and *Del Guidice* Complaints.

280.   The protective order barred the parties to the Biovail securities action from using documents, materials, or information covered by the order for any purpose other than the prosecution or defense of the Biovail securities action.

281.   In a written opinion and order dated January 26, 2007, the Honorable Richard Owen, U.S.D.J., found that Biovail had willfully violated the protective order by using documents produced by Bank of America Securities LLC, subject to the protective order, to draft its RICO claims.

282.   In hearings arising out of Biovail's violation of the protective order it was determined that the *Del Guidice* Complaint was not prepared by Del Guidice's attorney, but rather that the Complaint was prepared by Biovail's attorneys, who were paid for doing so by Biovail.

283.   Biovail's counsel, moreover, identified a shareholder to serve as the plaintiff in the *Del Guidice* action.

284.   Following Judge Owen's January 26, 2007 Order, instead of dismissing the *Del Guidice* complaint, on January 31, 2007, Lead Plaintiff, through his counsel Federman and Smith, filed an Amended Complaint, again based almost entirely upon the *Biovail* Complaint.

285.   The *Biovail* Complaint named David Maris, "the Banc of America Securities analyst covering specialty pharmaceuticals," as one of the key defendants in the purported conspiracy against it.

286.   As Biovail's conspiracy case crumbled it was compelled to ***pay*** Banc of America Securities and David Maris to settle the claims Biovail had brought.

- 44 -

287.   Notwithstanding the lack of basis for its remaining conspiracy claims, Biovail issued a September 2007 Press Release claiming "today's settlement agreement with Banc of America Securities and one of its former analysts David Maris, is expected to be extremely helpful in Biovail's pursuit of its lawsuit. The company said that the settlement provides, among other things, an agreement by Mr. Maris to provide substantial sworn testimony, voluntary production of material documents from BAS and Mr. Maris and the right to demand additional discovery of BAS and Mr. Maris which would include all relevant materials, such as e-mails, correspondence, tape recordings and trading records."

288.   Upon information and belief, no such testimony was sought from Maris and Biovail had no reasonable basis to believe that any testimony Maris might provide would be in any way helpful to any position Biovail had taken.

289.   One day after Biovail's assertions about the anticipated cooperation of Maris, attorneys for Maris issued a statement that clearly repudiated Biovail's claims, stating:

> Contrary to the suggestion in Biovail's September 10, 2007 press release, Maris is not cooperating with Biovail. Under his Settlement Agreement with Biovail and Eugene Melnyk, David Maris has no obligation to cooperate with Biovail or to answer any questions unless Biovail seeks to depose him. If Biovail does seek to depose him, Maris will respond truthfully to questions asked by all parties, including Biovail. Although Biovail is free to seek his deposition, Maris does not believe that his answers to questions about this case will assist Biovail in its cause. To the contrary, Maris is unaware of any conspiracy against Biovail and does not believe any such conspiracy ever existed.

290.   By letter dated May 1, 2008, defense counsel for Gradient in the *Biovail* matter demanded that Biovail dismiss its frivolous complaint.

291.   Biovail, however, refused to dismiss the complaint.

- 45 -

292.   By Order and decision dated February 19, 2009, Judge Chesler dismissed the *Del Guidice* action with prejudice as part of a Rule 11 sanctions motion.

293.   In his February 19, 2009 decision dismissing the *Del Guidice* action United States Judge Chesler pointed out that the "record before the Court suggests that these proceedings and the RICO action proceedings were all part of a choreographed strategy by Biovail and its attorneys designed to constitute a counterattack against the Biovail securities action."   A copy of Judge Chesler's February 19, 2009 opinion is attached hereto as Exhibit D, see page 23.

294.   Judge Chesler opined that Biovail's theory of wrongdoing in the *Del Guidice* action was "incompatible with Biovail's admission of guilt in a kickback scheme that the [*Del Guidice*] Amended Complaint accuses Defendants of falsely reporting and with Biovail's admissions, in connection with the settlement of the SEC enforcement action, of making false statements that inflated [Biovail's] stock price."   See Exhibit D at page 21.

295.   Notwithstanding all of the foregoing, Biovail continued to refuse to dismiss the *Biovail* Complaint.

296.   Instead, Biovail moved to amend the *Biovail* Complaint to dismiss the New Jersey RICO claims acknowledging for the first time that the claims were incompatible with its own admitted fraudulent accounting practices and criminal activity.

297.   Biovail also sought to replace Biovail Pharmaceuticals, LLC as a plaintiff in place of Biovail Pharmaceuticals, Inc., representing that Biovail Pharmaceuticals, LLC was a successor to Biovail Pharmaceuticals, Inc.

298.   Biovail also belatedly voluntarily dismissed its Complaint against Drs. Bettis and Vickrey.   However Biovail still pursued its claims against Gradient as a

3440070v1(50538.13)

defendant in its amended pleading and continued to assert its fabricated conspiracy claims.

299.   By 2009 Biovail's sole remaining damage claim against Gradient was based upon the drop in share price alleged to be the result of the conspiracy against it.

300.   Notwithstanding Biovail's various settlements and guilty pleas, in 2009, Biovail still sought to **add** a "trade libel and disparagement" count to its Complaint against Gradient and others despite being specifically aware that Gradient's statements were true and therefore could not state a claim for trade liable and disparagement.

301.   In August 2009, New Jersey Superior Court Judge Donald Goldman signed an order dismissing the *Biovail* Complaint finding it failed to state a claim against the remaining defendants.  A copy of Judge Goldman's Opinion dismissing the State Court action is attached hereto as Exhibit E.

302.   Judge Goldman determined that Biovail's proposed Amended Complaint failed to present a *prima facia* case for trade libel.  See Exhibit E at page 29.

303.   Judge Goldman determined that Gradient had not made any statements disparaging a product sold or service offered  by Biovail.  Instead, Gradient's reports referred to the manner in which Biovail conducted its business and its viability.  See Exhibit E at page 29.

304.   No appeal was taken from that order of dismissal, and it is therefore final.

G.   **DUE TO BIOVAIL'S MALICIOUS PROSECUTION, PUBLIC RELATIONS CAMPAIGN AND HARASSMENT, PLAINTIFFS SUFFERED SEVERE PERSONAL AND ECONOMIC     DAMAGES AND DAMAGES TO REPUTATION**

305.   Biovail's allegation that Gradient's entire business model was a "sham" caused Gradient to lose clients and prevented the gain of additional clients.

306.   Biovail's personal attacks directed at Drs. Bettis and Vickrey caused them embarrassment, humiliation, damage to their reputations, and financial harm.

307.   Biovail's malicious and false allegations also caused Plaintiffs to lose business opportunities.

308.   The economic damages caused by Biovail's malicious prosecution of the Lawsuits included a substantial personal economic loss to Drs. Bettis and Vickrey.  Dr. Bettis  was the majority owner of Equity Methods, and Dr. Vickrey had a minority equity interest.  As a result of the extensive adverse publicity resulting from Biovail's false claims, Dr. Bettis was compelled to reduce the up front sale price of Equity Methods to Merrill Lynch by $5 million resulting in a direct personal loss to Drs. Bettis and Vickrey.

309.   Gradient was compelled to retain and pay its own attorneys to respond to inquires from the SEC which upon information and belief arose out of Biovail's baseless conspiracy charges.   While the inquiry was ultimately closed with no finding of wrongdoing on the part of Gradient, the cost to defend the inquiry and its effects on the reputations of Gradient and Drs. Vickrey and Bettis were great.

310.   Gradient was compelled to hire and pay additional employees solely to address issues arising out of the litigation generated by Biovail.

311.   Existing Gradient employees were compelled to spend enormous amounts of time addressing Biovail litigation related issues, reducing their productivity at Gradient.

312.   Gradient was compelled to retain its own public relations firms to respond to Biovail's groundless assertions and press coverage, including the aforementioned *60 Minutes* piece, which was manufactured by Biovail's public relations firm.

313.   Drs. Bettis and Vickrey suffered severe damage to their personal and professional reputations.

3440070v1(50538.13)

314.   The principals of Gradient were required to make personal loans to Gradient due to the damage to Gradient's business caused by Biovail's malicious prosecution resulting in personal loss of investment income and the inability to take advantage of other business opportunities.

315.   Gradient's business was so badly damaged by Biovail's attacks that it was forced to close its Carlsbad, California office, although contract obligations required that it continue to bear the fixed costs associated with the previously needed office.

316.   Gradient's revenues fell sharply as a result of Biovail's false and malicious claims.   On numerous occasions, prospective clients specifically advised Gradient that they were unwilling to utilize Gradient due to negative publicity generated by Biovail's allegations against Plaintiffs.   Additionally, then existing clients cancelled Gradient's service citing the same reasons.

317.   Gradient experienced increased employee turnover as a result of Biovail's actions, which reduced Gradient's profitability and caused it additional costs.

318.   Gradient experienced increased difficulty and costs in hiring new analysts as a result of Biovail's attack on the company and its assertion that Gradient's business model was a sham.

319.   Moreover, prior to the *Biovail* lawsuit. Dr. Bettis was planning to sell Gradient.   As a result of Biovail's action and the related negative publicity, he was unable to do so resulting in a substantial economic loss.   The value of Gradient's business has been severely and permanently damaged as a result of Biovail's malicious prosecution resulting in additional losses.

## COUNT I
## MALICIOUS PROSECUTION/WRONGFUL INSTITUTION OF CIVIL PROCEEDINGS

320.   Plaintiffs, Gradient Analytic, Inc., Donn Vickrey, and James Carlton Carr Bettis, repeat and incorporate by reference all of the allegations contained in the preceding paragraphs as though set forth at length herein.

321.   Biovail instituted both the *Biovail* and *Del Guidice* Complaints against Plaintiffs.

322.   Biovail's decision to institute the *Biovail* and *Del Guidice* Complaints was motivated by malice.

323.   Both the *Biovail* and *Del Guidice* Complaints contained allegations against Plaintiffs that Biovail knew to be false when the Complaints were filed.

324.   To the extent that Biovail was not specifically aware that the allegations contained in the *Biovail* and the *Del Guidice* Complaints were false when made, they soon learned of the falsity of these allegations.   Nonetheless, Biovail continued to maintain these lawsuits and the public relations campaign with full knowledge of the falsity of the allegations.

325.   Biovail began and maintained the *Biovail* and the *Del Guidice* actions without probable cause and with knowledge of the falsity of the allegations.

326.   Both the *Biovail* and *Del Guidice* actions were terminated in Plaintiffs' favor.

327.   As a direct and proximate result of Biovail's improper actions, Plaintiffs were caused to suffer damages, including but not limited harm to their reputations, embarrassment, inconvenience, emotional distress, consequential damages, compensatory

3440070v1(50538.13)

damages, and the attorney's fees and costs they incurred to defend the *Biovail* and *Del Guidice* actions.

## COUNT II
## PUNITIVE DAMAGES

328.   Plaintiffs, Gradient Analytic, Inc., Donn Vickrey, and James Carlton Carr Bettis, repeat and incorporate by reference all of the allegations contained in the preceding paragraphs as though set forth at length herein.

329.   Biovail's actions against Plaintiffs were intended to cause Plaintiffs harm, and were motivated by malice, spite, and ill will.   These actions were intentional, outrageous, and thus entitle Plaintiffs to punitive damages.

330.   Biovail filed the *Biovail* and *Del Guidice* lawsuits to serve its own interests, knowing and consciously disregarding the substantial risk that its conduct might significantly injure Plaintiffs.

331.   As a direct and proximate result of Biovail's improper actions, Plaintiffs were caused to suffer damages, including but not limited to harm to their reputations, embarrassment, inconvenience, emotional distress, consequential damages, compensatory damages, and the attorney's fees and costs they incurred to defend the *Biovail* and *Del Guidice* actions.

## DEMAND

WHEREFORE, Plaintiffs, Gradient Analytic, Inc., Donn Vickrey, and James Carlton Carr Bettis, hereby demand judgment in their favor and an award of compensatory, consequential and punitive damages against Defendants, Biovail Corporation, Biovail Pharmaceuticals, Inc., and Biovail Pharmaceuticals, LLC along with interest, attorney's fees, costs, and such other and further relief as the Court deems just and proper.

3440070v1(50538.13)

1

RESPECTFULLY SUBMITTED this 17th day of February, 2010.

2

JENNINGS, STROUSS & SALMON, P.L.C.

3

4

By ___/s/ Jimmie W. Pursell_____

5

Kenneth C. Sundlof, Jr.
Jimmie W. Pursell, Jr.

6

The Collier Center – 11th Floor
201 East Washington Street

7

Phoenix, Arizona  85004-2385

8

WHITE AND WILLIAMS LLP

9

Michael O. Kassak, Esquire
Christopher P. Leise, Esquire

10

Edward M. Koch, Esquire
LibertyView

11

457 Haddonfield Road, Suite 400
Cherry Hill, NJ 08002-2220

12

Phone: 856-317-3600
Attorneys for Plaintiffs Gradient Analytics,

13

Don Vickrey and James Carlton Carr Bettis

14

15

16

17

18

19

20

21

22

23

24

25

26

- 52 -

1
2
3

COPY of the foregoing electronically
transmitted to the Clerk's Office using
the ECF System for filing and transmittal
of a Notice of Electronic Filing to the
following ECF registrants this 17th day
of February, 2010.

4
5

By    /s/ Michele Maser

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

3440070v1(50538.13)